**CONTACT LENS MANUFACTURERS ASSOCIATION, Petitioner,**

v.

**FOOD & DRUG ADMINISTRATION of the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 84–1025.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1985.

Decided July 9, 1985.

Daniel J. Manelli, Washington D.C., with whom Edward A. Scallet, Washington, D.C., was on brief, for petitioner.

Beverly Sherman Nash, Atty., Dept. of Justice, Richard K. Willard, Acting Asst. Atty. Gen., J. Patrick Glynn, Margaret A. Cotter, Mark H. Gallant, Attys., Dept. of Justice and Michael M. Landa, Atty., Food and Drug Admin., Washington, D.C., for respondent.

Before ROBINSON, Chief Judge, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge.

In 1938, Congress armed the Food and Drug Administration (FDA) with authority to prevent the marketing of hazardous drugs. By the mid-1970's, however, it had become apparent that the legislature's delineation of the FDA's domain was too narrow to enable the agency to protect the public from some of the most dangerous health care products. Mindful of recent misfortunes involving faulty pacemakers and the Dalkon Shield, Congress enacted the Medical Device Amendments of 1976 (Amendments or statute), Pub.L. No. 94–295, 90 Stat. 539 (codified at 21 U.S.C. §§ 360c–360k (1982)), thereby extending the FDA's pre-market surveillance field beyond drugs to medical devices. This case, one of first impression, involves the FDA's administration of the Amendments.

Congress' new prescription for the FDA divided the world of medical devices into three classes, according to the degree of regulation thought necessary to provide reasonable assurance of each device's "safety and effectiveness." Class I encompassed devices whose safety and effectiveness could be reasonably assured by "general controls" set out in various sections of the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–392 (1982). Class II covered devices that posed somewhat greater risks; devices placed in this category would be subject to "performance standards" in addition to the residual general controls. Class III was to obtain devices (1) whose safety and effectiveness could not be reasonably assured by any combination of general controls and performance standards, and (2) whose purported purpose was to aid in supporting or sustaining human life or preventing its impairment, or whose availability presented "a potential unreasonable risk of illness or injury." No device consigned to class III could be sold to the general public until, through a costly and time-consuming process, it had gained the FDA's "premarket approval." *See* Id. § 360c(a)(1).

Congress itself was not positioned to determine the appropriate classification of every medical device then in existence or yet to be invented; nor could it describe the statutory categories with sufficient precision to ensure that each device would simply fall into the proper class of its own accord. The legislators therefore charged the FDA with the task of implementing the Amendments, and thus of essaying judgments appropriate to ensure safe and effective medical devices without stifling innovative technology. *See* H.R.REP. No. 853, 94th Cong., 2d Sess. 12–13 (1976) [hereinafter cited as HOUSE REPORT].

Congress drew several initial bright lines, however, that significantly affected the classification process. "[D]evices of a type introduced or delivered for introduction into interstate commerce for commercial distribution" before the date of the Amendments' enactment were to remain entirely outside the classification scheme until the FDA decided where to place them. *See* 21 U.S.C. § 360c(c)(3); General Provisions and Classification of 119 Devices, 47 Fed.Reg. 3694, 3694 (1982) [hereinafter cited as Mass Classification Proposal]. Devices introduced after the date of enactment, by contrast, would rank in class III unless shown to belong to a non-class-III family of devices and to be "substantially equivalent" to a particular, already-marketed device within that family. *See* 21 U.S.C. § 360c(f)(1)(A); 21 C.F.R. § 860.134 (1984). Moreover, under provisions labeled "transitional," class III ranking automatically attached to "[a]ny device intended for human use … which the [FDA] in a notice published in the Federal Register before the enactment date has declared to be a new drug." 21 U.S.C. § 360j(*l*)(1)(E). The FDA could later reclassify any device that, for whatever reason, had been "overclassified," but this remedy required a proffer of "new information," *id.* § 360c(e)—or, as the FDA formulated the standard, "valid scientific evidence" of safety and effectiveness. 21 C.F.R. §§ 860.7, .123(a)(6).

The instant petition concerns the first attempt ever to reclassify a medical device committed to class III by the Amendments' "transitional provisions." Contact Lens Manufacturers Association (CLMA) challenges the FDA's withdrawal of the agency's own proposal to transfer certain rigid gas permeable (RGP) contact lenses from class III to class I. 48 Fed.Reg. 56,778 (1983). Claiming that RGP lenses (and hence, RGP lens manufacturers) have suffered disparate treatment in relation to other medical devices (indeed, other contact lenses), CLMA urges that "something has gone very wrong here." Brief of Petitioner at 2. We conclude, however, that CLMA's travails are attributable to the intricacies of the legislation Congress ordered, and to the broad administrative discretion Congress conferred upon the FDA. Because our review satisfies us that the FDA has permissibly exercised its considerable discretion in this case, we affirm the agency's action.

## I.

Contact lenses consisting almost entirely of polymethylmethacrylate (PMMA)—"hard" lenses—have been marketed in the United States since the early 1950's. *See* Regulatory Policy and Proposed Rulemaking for Marketing Contact Lenses, 40 Fed. Reg. 44,844, 44,845 (1975) [hereinafter cited as New Drug Notice]. Because the public's pre-Amendments experience with PMMA lenses was broad and substantially injury-free, *see id.*, these lenses will remain outside the Amendments' classification scheme until the FDA formally decides where to place them. *See supra* p. 594. That decision has not yet been made; three years ago, however, the FDA proposed to regulate PMMA lenses as class II devices. *See* Mass Classification Proposal, 47 Fed. Reg. at 3736.

Hydroxyethylmethacrylate (HEMA) lenses—"soft" lenses—are a more recent development. The FDA first approved a HEMA lens in 1971. *See* 47 Fed.Reg. 53,411, 43,-415 (1982). In September 1975, citing their relative novelty, the FDA announced that HEMA lenses—indeed all lenses "other than those consisting [almost wholly] of PMMA"—had been and would continue to be regarded as "new drugs":

> This decision to regulate such contact lenses under the new drug provisions of the Federal Food, Drug, and Cosmetic Act was based on a recognition that new plastic materials that had not been shown to be safe and effective were being introduced for use in the manufacture of contact lenses. The introduction of these new materials led to new lens design and use, new manufacturing methods, and new methods for lens care. The Food and Drug Administration is concerned that the use of these contact lenses may result in serious eye damage if the new material of which they are composed is unsafe for use in the eye, if the user cannot feasibly care for the lenses, or if the highly complex proce-

dures for the manufacture of these lenses are not carefully controlled to assure a product of uniform quality.

New Drug Notice, 40 Fed.Reg. at 44,845. This announcement rendered HEMA lenses class III devices under the Amendments' "transitional provisions." *See supra* p. 594; *cf. infra* note 3 (rejection of reclassification proposal).

The product at issue in this case is said to combine attractive features of both lens types described above. "RGP lenses" (like "PMMA lenses" or "HEMA lenses") is a generic term that indicates no single mix of polymers or manufacturing process; but all lenses properly called RGP share certain salient characteristics. The ideal RGP lens permits both the superior visual acuity attainable with a hard lens and the "direct transmission of oxygen to corneal tissue" that the hard lens regrettably prevents. *See* 47 Fed.Reg. 53,402, 53,406 (1982) [hereinafter cited as Reclassification Proposal]. Nearly a million people in the United States wore RGP lenses in 1982. *Id.*[1] As of 1975, however, RGP lenses, like soft lenses, were comparatively new and untested; since enactment of the Amendments the FDA has regarded RGP lenses as "transitional" class III devices by reason of the same September 1975 *Federal Register* announcement that resulted in placement of HEMA lenses in the class III category. *See supra* p. 595; *infra* p. 598.

Consequently, before a manufacturer can market a particular RGP lens to the public, the manufacturer must demonstrate the safety and effectiveness of that lens convincingly enough to gain the FDA's premarket approval. "[I]n effect," the manufacturer must obtain "a license to market the device." Brief for Respondent at 5 n. 6. (If RGP lenses were class I devices, the manufacturer would be required to make the showing CLMA regards as less burdensome that the lens was "substantially equivalent" to another RGP lens already on the market. *See* 21 U.S.C. § 360c(f)(1)(A)

---

**1.** Counsel for CLMA, demonstrating warm zeal for his client, informed the court in opening lines of oral argument that he and his co-counsel were themselves satisfied wearers of RGP lenses.

(1982); *supra* p. 594. *But see infra* pp. 601–602.) The expense of obtaining a class III device license—"estimated at $750,000–$1,000,000 (over and above development costs)," Brief of Petitioner at 11, the bulk of which goes to clinical investigation—constitutes a significant barrier to entry. Not surprisingly, the first and largest of several manufacturers to surmount the premarket-approval hurdle, Syntex Ophthalmics, commands a dominant share of the market for RGP lenses. CLMA barely disguises its suggestion that Syntex is implicated in the FDA's decision to hold RGP lenses within the class III regime.

That decision did not follow a steady path. In March 1981 CLMA petitioned the FDA to reclassify RGP lenses from class III to class II. Pursuant to 21 U.S.C. § 360c(b) (1982), the FDA referred the petition to an expert advisory committee, the Ophthalmic Section of the Ophthalmic; Ear, Nose, and Throat; and Dental Devices Panel, which recommended the following month that the petition be granted on the condition that CLMA submit additional materials. In November 1981 the FDA announced that although CLMA's upgraded submissions continued to be inadequate, "CLMA's objectives are meritorious," and therefore the FDA intended to adopt the reclassification proposal as the agency's own. *See* 46 Fed.Reg. 57,648 (1981). The FDA promised to publish a formal proposal in a future issue of the *Federal Register;* meanwhile, the agency solicited comment on various economic issues that appeared unrelated to the lenses' safety and effectiveness. *See id.* at 57,648–49.

In November 1982, a year after the FDA's initial indication of interest, the reclassification proposal emerged.[2] "Based on a careful review of new, publicly available, valid scientific evidence," the proposal stated, "FDA has tentatively concluded that ... certain [RGP lenses] should be reclassified into class I." Reclassification Proposal, 47 Fed.Reg. at 53,404. The pro-

posal was limited to spherical lenses consisting of cellulose acetate butyrate (CAB) or polyacrylate-silicone. *Id.* But departing from CLMA's original request for class II designation, the proposal recommended reclassification down to class I. Although the FDA then "believe[d] that sufficient information exist[ed] to establish a [class II performance] standard," the agency also felt that safety and effectiveness could be adequately assured without such a standard. *Id.* at 53,405–06. The proposal extensively and favorably discussed the clinical data cited by reclassification proponents. Nevertheless, the FDA invited comment on a range of issues including the following:

> 1. Do the data presented in this proposal constitute sufficient "valid scientific evidence" of safety and effectiveness to support reclassification of each [currently] marketed lens [and any lens that might be created] consisting of CAB or polyacrylatesilicone?
>
> . . . .
>
> 4. Does specifying the materials of which the lenses proposed for reclassification are principally composed adequately identify the lenses for the purpose of reclassification?

*Id.* at 53,410.

The uncertainty intimated by these questions soon became palpable. On December 10, 1982, the FDA extended the comment period thirty days, till January 26, 1983. 47 Fed.Reg. 55,497 (1982). On April 15, 1983, the comment period was reopened. 48 Fed.Reg. 16,293 (1983). A public hearing was held on May 26, 1983, followed by yet another fifteen-day comment period. *See* 48 Fed.Reg. 18,836 (1983). Finally, on December 23, 1983, CLMA's once high expectations for the RGP proposal ended: the FDA repudiated its "tentative conclusions"

---

**2.** In the interim, FDA representatives had been questioned by members of a House subcommittee about the "rather unusual" delay. *FDA Oversight: Medical Devices: Hearing Before the Sub-*

*comm. on Oversight and Investigations of the House Comm. on Energy and Commerce,* 97th Cong., 2d Sess. 3 (1982) (remarks of Rep. Whittaker); *see id.* at 29–34, 95–96, 104–06.

and withdrew its reclassification proposal altogether. 48 Fed.Reg. 56,778 (1983).[3]

The FDA attributed its changed view to "comments and oral and written testimony that required it to reevaluate the evidence upon which it relied in the proposal, and to evaluate additional information." *Id.* at 56,781. First, the agency explained, various commenters had demonstrated that the clinical studies cited as proof of the safety and effectiveness of CAB and polyacrylatesilicone lenses[4] then on the market did not, after all, add up to "valid scientific evidence." *Id.* at 56,780. Second, even if the studies did constitute such evidence, they were "insufficient to justify reclassification" because they "fail[ed] to establish the safety and effectiveness of [RGP] lenses as a generic type of device." *Id.* Given the countless conceivable combinations of "polymer formulation and manufacturing processes," and the corresponding variations in lenses' "nontoxicity, biocompatibility, [and] light transmission," the FDA could not conclude that mere membership in the family of "RGP lenses" clinched any particular lens' safety and effectiveness. *Id.*

The FDA thus determined that no reclassification of RGP lenses could provide reasonable assurance of safety and effectiveness: class I status was not feasible because the FDA could not determine whether a new lens was "substantially equivalent" to an already-marketed lens without securing a wealth of detailed information about both lenses' composition and manufacture; and class II status was not in order because, even if such information could be gathered for the purpose of estab-

lishing a "performance standard" and measuring new lenses against it, conformity with the standard would not guarantee that a lens would function safely and effectively in the human eye. *Id.* at 56,780–81. "In short, FDA learned that at this stage in [RGP lens] development, there is no substitute for clinical trials [i.e., class III status] to provide reasonable assurance of the safety and effectiveness of these lenses." *Id.* at 56,781.

CLMA complains, in petitioning for review, that the FDA has disregarded a medical consensus favoring reclassification and has rendered insensible the requirement of "valid scientific evidence." We recognize substantial merit in CLMA's argument that RGP lenses should not be locked within so tight a regulatory regime. Nonetheless, we cannot disturb the FDA's decision. The agency acted within an area of its expertise, it ruled in a manner at least arguably consistent with the statutory scheme, and it considered the matter in a detailed, adequately reasoned fashion. We therefore defer to the agency and affirm its judgment. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* — U.S. ——, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Rettig v. Pension Benefit Guaranty Corp.,* 744 F.2d 133, 151 (D.C. Cir.1984) (quoting *Chevron* ).

## II.

■ We address at the outset CLMA arguments that the entire reclassification project was misconceived because RGP lenses were never class III devices to begin with. FDA's responses[5] indicate, correctly

---

**3.** CLMA's petition to reclassify HEMA lenses underwent a parallel odyssey and met an identical fate. Finding CLMA's January 1981 proposal deficient, the FDA itself took up the reclassification cause. 46 Fed.Reg. 57,648 (1981). A year later, the FDA formulated an official proposal to transfer HEMA lenses from class III to class I, and asked for comments. 47 Fed.Reg. 53,411 (1982). After enlarging the comment period, reopening it, holding a public hearing, and receiving more comments, the FDA killed the proposal on April 24, 1984. 49 Fed.Reg. 17,523 (1984).

**4.** The petition for review concerns only the FDA's treatment of polyacrylate-silicone lenses. Brief of Petitioner at 8 n. 4. Accordingly, the term "RGP lenses," as henceforth used in this opinion, denotes lenses made of polyacrylate-silicone.

**5.** The FDA initially asserts that we lack "jurisdiction" to consider these arguments "because CLMA did not raise them in the rulemaking proceeding." Brief for Respondent at 51. If the arguments were placed before the agency, however, we may review them even if CLMA was not the presenter. *See Toy Mfrs. of Am. v. Consumer Prod. Safety Comm'n,* 630 F.2d 70, 73

as we see the regulatory scheme, the limitations of the categories Congress established.

■ First, CLMA maintains that RGP lenses are not properly drawn into the web of the Amendments' "transitional provisions." The provision in question assigns to class III "[a]ny device intended for human use ... which the [FDA] in a notice published in the Federal Register before the enactment date has declared to be a new drug." 21 U.S.C. § 360j(*l*)(1)(E) (1982). The FDA identifies its September 1975 announcement of "Regulatory Policy and Proposed Rulemaking for Marketing Contact Lenses," *see supra* p. 595, as the relevant notice. CLMA characterizes that notice as a preliminary announcement, merely a proposal for a declaration of new drug status, not the declaration itself. Brief of Petitioner at 52.

The asserted distinction between declaration and proposed declaration, in the context of the Amendments, lacks persuasive force. The statute requires only notice—not, for example, notice tested in the crucible of public comment. Further, to the extent that CLMA's argument rests not on statutory interpretation but on construction of the September 1975 declaration as tentative, we cannot agree. The announcement conveys the distinct impression that regulation of non-PMMA lenses as "new drugs" was a fait accompli, at that stage missing only a formal seal:

> The policy of the [FDA] of regarding all contact lenses other than those consisting [almost] entirely of PMMA as new drugs has been publicized and is generally known to contact lens manufacturers....
>
> ....
>
> Although the Agency's enforcement policy regarding contact lenses has previously been publicized, this policy is not set forth in Title 21 of the Code of Federal Regulations. Accordingly, the Commissioner of Food and Drugs has concluded that, formally to advise the public, this regulatory policy should be promulgated as a regulation and codified in Title 21, C.F.R.

New Drug Notice, 40 Fed.Reg. at 44,845.[6]

Second, CLMA contends that RGP lenses are "custom devices" as that term is defined in the Amendments, and are on that account exempt from the classification scheme. A "custom device" is

> any device which, in order to comply with the order of an individual physician or dentist ... necessarily deviates from an otherwise applicable performance standard or [premarket approval] requirement ... if (1) the device is not generally

n. 5 (2d Cir.1980); *see also Lorion v. United States NRC,* 712 F.2d 1472, 1474 (D.C.Cir.1983) (court reviews "only those contentions subjected to agency scrutiny during the administrative process"), *rev'd on other grounds sub nom. Florida Power & Light Co. v. Lorion,* — U.S. —, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Inspection of the challenged withdrawal notice reveals that the arguments in question, or substantially similar ones, were in fact rehearsed before the agency.

6. CLMA also suggests that the September 1975 announcement was inadequate in that it "did not mention polyacrylate-silicone lenses. The only polymers specifically mentioned were CAB ..., polycarbonate, silicone, and HEMA, types of contact lenses which are readily distinguishable from polyacrylate silicone." Brief of Petitioner at 53. But the list to which CLMA refers did not purport to be exclusive. It merely cited examples of contact lens materials about whose safety and effectiveness the FDA was particular-

ly concerned—materials "other than PMMA." New Drug Notice, 40 Fed.Reg. at 44,845. Polyacrylate-silicone, CLMA does not deny, is a further example of such material.

Our view that RGP lenses were covered by the September 1975 announcement, and are therefore properly ranked as class III devices under the Amendments' transitional provisions, suffices to answer CLMA's further contention that these lenses merit less stringent regulation because of their "substantial equivalen[ce]" to PMMA lenses. *See* Brief of Petitioner at 61–63. The 1975 announcement, and subsequent FDA glosses on it, foreclose any argument that RGP lenses and lenses made almost entirely of PMMA instance the same "type of device"; thus, there is no occasion for a substantial-equivalence determination. *See* 21 U.S.C. § 360c(f)(1)(A) (1982); *cf.* 21 C.F.R. § 860.84 (1984) (distinguishing, for classification purposes, between (1) devices substantially equivalent to pre-Amendments devices, and (2) devices regulated as "new drugs").

available in finished form for purchase or for dispensing upon prescription and is not offered through labeling or advertising by the manufacturer, importer, or distributor thereof for commercial distribution, and (2) such device—

> (A)(i) is intended for use by an individual patient named in such order of such physician or dentist ... and is to be made in a specific form for such patient, [and]
>
> .   .   .   .   .
>
> (B) is not generally available to or generally used by other physicians or dentists....

21 U.S.C. § 360j(b) (1982). The definition is an eyeful, but essentially it appears to reflect a commonsense congressional judgment that the design and composition of certain medical devices are so individualized that subjecting them to the usual regulatory controls would be impractical (and a complementary judgment that such particularly constructed devices are so closely monitored by the prescribing physician that stringent regulation might well be excessive). The House Report on the Amendments lists as examples of custom devices "orthopedic and other prosthetic devices, dental devices, and specially-designed orthopedic footwear"; the same report cautions that invocation of the exemption must be "limited." HOUSE REPORT, *supra* p. 3, at 44.

■ We are satisfied that the FDA acted reasonably in refusing to accord custom-device status to RGP lenses. It suffices to observe that the FDA could rationally regard such lenses as "generally available to or generally used by other physicians." CLMA's argument to the contrary focuses obsessively on the individual lens ground to a particular doctor's specifications; CLMA disregards the consideration, urged by the FDA, that the statutory language is most sensibly read as referring to a more or less inclusive class of devices rather than to any given exemplar of the class. And even if the relevant question were whether a specifically prescribed lens was "generally available to or generally used by other physicians," there would be force to the FDA's contention that any specimen lens "is merely a variation within an approved range of powers and anterior and posterior surface contours." Brief for Respondent at 62. In other words, prescriptions for all but the most pathological eyes are likely to be replicated again and again and thus to be "generally used." CLMA insists that this construction of "generally used" could as easily lead to a ruling that orthopedic shoes are not "custom devices." But insofar as the FDA's conclusion from the logic and language of the statute appears contrary to the result intimated by some of the examples of "custom devices" offered in the legislative history, the FDA has properly cast its lot with the former. *See, e.g., Eagle-Picher Industries v. United States EPA*, 759 F.2d 922, 929 (D.C.Cir.1985).

In short, it appears to us from the arguments made that the premise on which the FDA's initial reclassification proposal rested—that RGP lenses are currently class III devices—is altogether reasonable. The critical question that remains is whether the FDA could rationally refuse to bring its reclassification proposal to fruition.

### III.

■ The FDA has consistently maintained that proponents of reclassification assume the burden of demonstrating—through "publicly available, valid scientific evidence"—that the device's present classification is inappropriate and that the proposed classification will provide reasonable assurance of the device's safety and effectiveness. *See, e.g.,* 48 Fed.Reg. at 56,779. We cannot fault the FDA's assignment of the burden of proof to those seeking to change the status quo. *See, e.g.,* HOUSE REPORT, *supra* p. 3, at 40. Thus, CLMA's claim that maintenance of class III status for RGP lenses lacks record support, even if true, is off target. More to the point, CLMA asserts that the FDA in these proceedings has adopted an unreasonably strict view of what constitutes "valid scientific evidence." Though CLMA presses this argument with vigor, we are mindful

that in such matters generalist courts see through a glass darkly and should be especially reluctant to upset an expert agency's judgment that a party has *failed* to adduce sufficient scientific proof of safety and effectiveness.

The FDA's rationale for withdrawing its reclassification proposal opens with the rather belated assertion that nothing in the record establishes the safety and effectiveness of RGP lenses now on the market. Facets of this position are unsettling. In justification of its current stance, the FDA disparaged, *see* 48 Fed.Reg. at 56,784–85, the same studies it had once acclaimed, *see* Reclassification Proposal, 47 Fed.Reg. at 53,406–09, and retracted, *see* 48 Fed.Reg. at 56,783, its earlier assertion that "[t]he safety of the device also is shown by the absence of reports in the literature of serious, irreversible adverse effects on health presented by the device," *see* Reclassification Proposal, 47 Fed.Reg. at 53,405. But the reclassification proposal specifically asked for comment on whether "the data ... constitute sufficient 'valid scientific evidence.'" *Id.* at 53,410. We would be denying the value of notice-and-comment rulemaking were we to condemn the FDA for altering its outlook on the basis of submissions it received.

Citing its regulation declaring that "[i]solated case reports, random experience, reports lacking sufficient details to permit scientific evaluation, and unsubstantiated opinions are not regarded as valid scientific evidence to show safety or effectiveness," 21 C.F.R. § 860.7(c)(2) (1984), the FDA discounted the praises sung by dozens of "contact lens professionals" who favored reclassification and who reported that none of their patients had ever experienced serious problems with RGP lenses. 48 Fed.

Reg. at 56,786–87. We find the FDA's categorical belittlement of these eyewitness comments somewhat numbing, but we cannot gainsay the FDA's judgment that although such testimonials may suffice to *disprove* safety and effectiveness, they fail to establish with scientific rigor the absence of danger. *See* 21 C.F.R. § 860.7(c)(2).

The FDA's ultimate resistance to conceding the safety and effectiveness of lenses now on the market is perhaps most remarkable because these are the very lenses already granted premarket approval on the application of particular manufacturers. The agency's demand for compelling proof on matters presumably demonstrated to it convincingly by the licensed manufacturers, however, is a conundrum the statute itself sets up. Under the Amendments, trade secret information that a manufacturer submits to secure premarket approval may not be cited by the FDA or any third party in aid of reclassification proposals. 21 U.S.C. § 360j(c), (h)(3) (1982). Much as in patent law, Congress has determined that free riding is too high a price to pay for vigorous competition among medical device manufacturers;[7] the FDA is not at liberty to disregard this determination.

Of decisive importance, however, the FDA's refusal to reclassify RGP lenses does not stand or fall with the FDA's limited-purpose agnosticism about the safety and effectiveness of lenses currently on the market. Independently sufficient and far more persuasive is the FDA's determination that all reclassification proposals to date "inadequately characterize" the class of RGP lenses. That is, even if the available evidence demonstrates the safety and effectiveness of lenses already on the mar-

---

**7.** As the legislative history explains:

To use trade secret information submitted in connection with a class III device as the basis for "downgrading" it into class II status—and thus allowing it to be replicated by competitors to conform to a standard—would destroy the originator's competitive advantage and could serve to stifle the initiative for innovation.

House Report, *supra* p. 3, at 50.

We note that Congress recently relaxed the proscriptions against free riding in the context of new drugs (as opposed to devices). Under the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (codified as 21 U.S.C. § 355(j), 35 U.S.C. § 156), an abbreviated new drug application can make use of prior approvals of the same product. The Act also allows patentees to obtain an extension of patent life to compensate for time lost during regulatory review.

ket, this evidence cannot be taken as proof that any RGP lens a manufacturer might create will meet the statutory requirements; thus, at least for the present, the premarket approval process is unavoidable. "[T]he safety and effectiveness of a contact lens is a function of the complex interrelationship of material, design, and manufacture that results in a unique set of physical, chemical, mechanical, and optical characteristics." 48 Fed.Reg. at 56,792. Alter any one of these variables, the FDA now maintains, and you have a unique new lens whose safety and effectiveness are unknown and, without thorough clinical testing, unknowable. To be sure, the reclassification proposal described RGP lenses generically in glowing terms: "Contact lenses composed of ... polyacrylate-silicone are characterized as chemically and physically stable under the conditions of their intended use, optically clear, nontoxic, and nonallergenic." Reclassification Proposal, 47 Fed.Reg. at 53,404. But in retrospective clarification, the FDA explains this statement as the depiction of a paradigm rather than an assertion that every potential combination of RGP materials, design, and manufacture will prove safe and effective.

The inadequacy of generic characterization of RGP lenses thus emerges as a mainstay of the FDA's contention that nothing short of lens-by-lens clinical testing and premarket approval will ensure safety and effectiveness. If RGP lenses were class I devices, the FDA would have no firmer basis on which to divine the safety and effectiveness of new lenses than a ninety-day inquiry into whether the lenses were "substantially equivalent" to other lenses already on the market. See 21 U.S.C. §§ 360(k), 360c(f)(1)(A) (1982); 21 C.F.R. § 807.87 (1984). In its reclassification proposal, the FDA asserted that such an inquiry would suffice—provided, however, that the prospective manufacturer was

prepared to demonstrate substantial equivalence in terms including, but not limited to, design; composition; optical transmission (and homogeneity) and index of refraction; and other physical properties including oxygen permeability, chemical and physical stability, tensile and flexural strength; biocompatibility, including cytotoxicity, eye irritation, and nonsupport of bacterial growth; impurities; leachables; heavy metal levels; preservative uptake and release; ... lens care/cleaning regimen compatibility[; and manufacturing process].

Reclassification Proposal, 47 Fed.Reg. at 53,405.

The detail of this checklist suggests that, from the start, the FDA felt insecure about reclassifying RGP lenses. Upon withdrawing its proposal, the FDA announced its tardy recognition that the contemplated submission would be "indistinguishable" from the data required in a premarket approval application. 48 Fed.Reg. at 56,790. In other words, on close inspection, the FDA determined that class I assignment simply was not feasible. Given the detailed data submission necessary to find "substantial equivalence," prospective RGP lens manufacturers would be put to a burden approaching that entailed by the premarket approval process. At the same time, appraising such evidence "on a comparison basis" rather than for the purpose of "determin[ing] the safety and effectiveness of a device in the first instance," id., would be both difficult and constraining. Not only would the problem of trade secret information, see supra p. 16, impede comparative evaluation; in addition, the exacting character of the comparisons involved might discourage innovation by requiring the manufacturer of a new RGP lens to demonstrate "substantial equivalence" almost to the point of patent infringement. See, e.g., Joint Appendix (J.A.) at 334 (comments of Dow Corning Ophthalmics).[8]

8. In discussing the "substantially equivalent" test, the Amendments' legislative history confirms that the FDA is well within its discretion in declining to attempt comparison of devices that are disparate in such important respects as composition or design: "differences between 'new' and marketed devices in materials [or] design ... would have a bearing on the adequacy of information as to a new device's safety and effectiveness, and such [new] devices should be automatically classified into class III." HOUSE REPORT, supra p. 3, at 36.

The FDA's doubts about generic characterization of RGP lenses led it to conclude as well that class II "performance standards," such as those formulated by the American National Standards Institute, would fail to provide reasonable assurance of safety and effectiveness. *See* 48 Fed. Reg. at 56,791. Although compliance with such standards may be easy to measure and may attest to a lens' physical, chemical, and optical integrity, the FDA observes that there is no scientifically proven relationship between fulfillment of the laboratory criteria and performance in the human eye.

On its face, the proposition that "minor changes in lens material formulation or manufacturing process can significantly [and unpredictably] affect the safety and effectiveness of lenses manufactured from the material," *id.* at 56,780, appears at least plausible. Indeed, a diluted form of this proposition—the chance that "there may conceivably be polymeric combinations within the category of polyacrylate-silicone which are not suitable for making RGP lenses"—strikes CLMA as "self-evident." Brief of Petitioner at 47. CLMA's complaint is that the imposition of expensive clinical testing requirements on each new type of RGP lens—requirements to which fewer than five percent of all medical devices are subject, *see id.* at 6 & n. 3—is wholly out of proportion to the lenses' capacity for mischief.

Given the record before the FDA, however, the agency could responsibly conclude that novel RGP lenses pose "a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C) (1982) (describing conditions under which FDA may place pre-Amendments device in class III); *see, e.g.,* J.A. 339 (comments of David M. Worthen, M.D.); *id.* at 354, 357 (comments of Syntex Ophthalmics, Inc.); *id.* at 381 (comments of Barnes-Hind/Hydrocurve, Inc.); *see also* Brief for Respondent at 53–55 (arguing that, in any event, CLMA failed to demonstrate the nonexistence of such risk). It is true that companies like Syntex Ophthalmics, whose RGP lenses had already won premarket approval, were the principal doomsayers. But their apparent interest does not render their comment valueless. *See National Soft Drink Association v. Block,* 721 F.2d 1348, 1354 (D.C.Cir.1983) ("We do not weigh the evidence; we merely examine the record to see if there is evidence, which if accepted by the Secretary, supports the determination of the agency.").[9]

We are troubled, nonetheless, by the argument that the FDA's treatment of RGP lenses, even if internally logical and supported by several comments in the record, is impeached by the agency's action in other dockets. Comparative sideglances, CLMA contends, demonstrate graphically that RGP lenses have received an inordinately hard look. For example, in January 1982, the FDA proposed to classify 119 previously unclassified ophthalmic devices already on the market when Congress passed the Amendments; in that proposal, the FDA described "artificial eyes" gener-

9. CLMA further contends that the FDA abused its discretion by failing to consider the controlled clinical setting in which contact lenses are prescribed and fitted. The safety and effectiveness of a device are to be determined, in part, "with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device." 21 U.S.C. § 360c(a)(2)(B) (1982). CLMA argues that RGP lenses present no risk of irreversible injury; rather, the patient's eyes simply get a little red, at which point his optometrist or ophthalmologist orders a different sort of lens. Brief of Petitioner at 33; *see* Reply Brief of Petitioner at 12 (in this manner, competition will weed out unsafe and ineffective lenses without the need for FDA supervision).

The FDA usefully might have supplied a more explicit acknowledgment of the context in which RGP lenses are marketed, and a fuller explanation of why that context does not obviate the need for strict regulation. *Cf.* 48 Fed. Reg. at 56,787–88 (denying that medical supervision justifies enlargement of reclassification proposal to encompass nonspherical lens designs about whose safety and effectiveness there is a "complete lack" of evidence). But CLMA's argument appears rooted in a premise the FDA has quite clearly rejected—that the risks posed by RGP lenses are too inconsequential to merit prior regulatory restraints. And surely the infamous histories of the two devices that principally inspired the Amendments, *see supra* p. 2, belie the assertion that the participation of a doctor renders premarket approval unnecessary.

ically as devices "usually made of glass or plastic," without any suggestion that a more precise specification of materials or manufacturing processes might be necessary. Mass Classification Proposal, 47 Fed.Reg. at 3724. It may make sense to say that devices designed for prolonged contact with so delicate and vital an organ as the living eye merit more circumspect regulation than do devices that merely stand in for that organ once it is lost; to the extent that this proposition is intuitively obvious, the FDA may be forgiven for not stating it. But how does the FDA account for its proposal, *id.* at 3736, to regulate PMMA lenses as class II devices? Is it not myopic for the FDA to ignore the variations in materials and manufacture of devices that appear to present risks of the same order as those posed by RGP lenses—devices that, in fact, raise the additional problem of depriving the cornea of oxygen?

The FDA implies that PMMA lenses' "extensive history of safe and effective human use" justifies a more lenient form of regulation. *See* 48 Fed.Reg. at 56,787. This response is not altogether satisfactory. Although an "extensive history of safe and effective human use" may constitute, or obviate the need for, "valid scientific evidence" of the safety and effectiveness of PMMA lenses currently on the market,[10] it cannot—by the FDA's own hypothesis—inform us about lenses that as yet are but a glimmer in a polymer chemist's eye. Perhaps the range of possibilities is narrower, the predictability of results greater, for PMMA lenses than for RGP lenses. *Cf.* 48 Fed.Reg. at 56,787 (suggesting "potential significant differences in ... uniformity" between PMMA and RGP lenses). If not,

we would be hard-pressed to reconcile differential classification of the two devices. *See also* J.A. 388 (comments of Precision-Cosmet Co.) (criticizing "the 'hard lens attitude' in the industry which is essentially [that] one will do just as one pleases, since 'hard' lenses have never hurt anyone").

But the issue is not ripe for our consideration. The FDA acts on classification initiatives at a pace fairly described as glacial. The January 1982 proposal to place PMMA lenses in class II remains only a proposal. Since that proposal antedates by almost two years the CLMA-challenged withdrawal of the proposed reclassification of RGP lenses, we would not be surprised if the FDA were having second thoughts. We do not prejudge the appropriate classification of PMMA lenses; we suggest only that, should the FDA ultimately decide to treat PMMA and RGP lenses differently, we will not feel that our respect for the agency's judgment has been vindicated unless the FDA explains why such a distinction is coherent. In the meantime PMMA lenses continue to be entirely free of any classification, but that is the way the statute Congress designed works.

## IV.

We are cognizant of the ironies effected by the statute and the FDA's initially insecure administration of it. Considering the difficulty of the assignment Congress entrusted to the agency, and the respect we owe to the FDA's expert judgment, however, we cannot say that the action we have been asked to review is unlawful. Many of CLMA's claims of inequitable treatment are better addressed to Congress; others

---

**10.** In its proposal to classify 119 ophthalmic devices, for instance, the FDA validated its advisory panel's reliance on essentially anecdotal evidence:

> In many cases, the Panel based its recommendations on Panel members' personal knowledge of, and clinical experience with, the devices under review. The Panel particularly relied upon clinical experience and judgment when considering a simple device that had been used extensively and was accepted widely before the amendments were enacted.... FDA has determined that clinical experience

and judgment is valid scientific evidence for classifying certain devices.

Mass Classification Proposal, 47 Fed.Reg. at 3696. The panel's recommendation regarding PMMA lenses seems to have been based on the same sort of evidence. *See id.* at 3736. By the year 2000, therefore, if the FDA follows a consistent course, we would expect questions about the safety and effectiveness of lenses already on the market, *see supra* pp. 15–16, to pose no continuing impediment to reclassification of RGP lenses.

**604**

are not yet ripe. We hold simply and only that at this juncture, the FDA has not been shown to have proceeded without reason or regard for the statute in withdrawing its proposal to reclassify RGP lenses. The petition for review is accordingly dismissed and the challenged decision is

*Affirmed.*