Barbara L. SHARP and Donald
Sharp, Plaintiffs,

v.

ARTIFEX, LIMITED, Defendant.

Civil Action No. 98–367.

United States District Court,
W.D. Pennsylvania.

Sept. 30, 1999.

John C. Evans, Specter, Specter, Evans & Manogue, Pittsburgh, PA, John J. Cummings, III, Frank C. Dudenhefer, New Orleans, LA, Darryl J. Tschirn, Tschirin & Thomson, La Jolla, CA, for Plaintiffs.

Russell J. Ober, Jr., Meyer, Unkovic & Scott, Pittsburgh, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

McLAUGHLIN, District Judge.

Plaintiffs Barbara and Donald Sharp brought the instant civil action to recover for injuries allegedly arising out of the implantation of a pedicle screw fixation device in Barbara Sharp's spine. This Court has diversity jurisdiction over the matter. Presently pending before the Court is Defendant's motion for partial summary judgment. Defendant requests judgment in its favor on Count II, the Plaintiffs' negligence *per se* claim, as well as on her other claims to the extent that they rely on alleged violations of the Food and Drug Administration's ("FDA") pre-market approval and performance standards. For the reasons set forth below, Defendant's motion is denied.

### I. BACKGROUND

Defendant Artifex, Limited ("Artifex") designs, manufactures and sells a pedicle screw fixation device known as the HBH Spinal System. *See* Pls. Mot. Summ. J. Ex. A ¶ 3. The device is composed of screws, plates, and nuts that may be implanted into the spine to provide an internal method of spinal fixation incident to spinal surgery. *See id.* The system also "includes a guide, which functions as a template to assist the implanting surgeon in placing the device, and certain other ancillary items." *Id.*

On July 17, 1992, Dr. David McGee performed surgery on Barbara Sharp, implanting one of Artifex's devices into her spine. Plaintiffs filed a complaint against Artifex on December 14, 1995 alleging claims of strict liability, negligence, negligence *per se* and breach of the implied warranty of liability.[1] Thereafter, this

---

1. Count I of the Plaintiffs' Amended Complaint alleges strict liability in tort, count II alleges negligence *per se,* count III alleges negligence and count IV alleges that the Defendant breached its implied warranty of merchantability. Also, count V alleges that as a result of the Defendant's conduct, Plaintiff

case was consolidated together with numerous other actions for pre-trial proceedings pursuant to the multidistrict litigation statute, 28 U.S.C. § 1407. The Judicial Panel on Multidistrict Litigation designated a district court for the Eastern District of Pennsylvania as the transferee court. During the multidistrict proceedings, Plaintiffs filed an amended complaint. Count II of the amended complaint alleges that defendant's violation of the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and its Medical Device Amendments ("MDA"), 21 U.S.C. § 360 *et seq.*, constituted negligence *per se* and proximately caused Barbara Sharp's injuries. *See* Am. Compl. ¶ 56.

The present case was transferred to this Court on December 28, 1998. Subsequently, Artifex filed this motion for partial summary judgment. It argues that Plaintiff's negligence *per se* claim must be dismissed because (1) its device is custom made for the Plaintiff and therefore exempt from pre-market approval and performance standards of the FDCA and MDA and (2) the FDCA and MDA do not contemplate a private right of action.

## II. FDCA AND MDA

The FDA regulates pedicle screw fixation devices under the FDCA, the MDA and the regulations promulgated thereunder. The MDA requires that the FDA classify medical devices into one of three categories depending on the risk they pose to the public. Class I devices do not present "a potential unreasonable risk of illness or injury," and are subject only to general manufacturing controls. 21 U.S.C. § 360c(a)(1)(A) (Supp.1999). Class II devices pose a greater risk and are therefore subject to federal performance regulations. *See id.* § 360c(a)(1)(B). They may, however, be marketed for general sale without pre-market approval by the FDA. *See id.* Finally, a device is placed into Class III if it "presents a potential unreasonable risk of illness or injury." *Id.* § 360c(a)(1)(C).

A Class III device is subject to pre-market approval by the FDA and thus may not be introduced into the market until the manufacturer provides the FDA with "reasonable assurance of its safety and effectiveness." *Id.* The approval process requires the manufacturer to submit "full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made known to show whether or not such device is safe and effective." *Id.* § 360e(c)(1)(A). It also requires that the manufacturer provide "a full statement of design and manufacturing plans, as well as any additional information requested by the agency." *In re Orthopedic Bone Screw Liab. Litig.,* 159 F.3d 817, 819 (3d Cir.1998) (citing 21 U.S.C. § 360e(c)(1)).

A manufacturer can apply for an Investigational Device Exemption ("IDE") which allows it to use the device in clinical trials so that it may "gather the type of data necessary to support a pre-market approval application." *Orthopedic Bone Screw,* 159 F.3d at 819; *see also* 21 U.S.C. § 360j(g) (Supp.1999); 21 C.F.R. § 812 (1999). A device approved for an IDE may not distributed commercially or marketed to the general public. *See* 21 C.F.R. § 821.7(a) (1999).

There are two exceptions to the Class III pre-market approval requirements. First, if the device is a predicate device such that it was "in commerce" prior to the enactment of the MDA on May 28, 1976, it may remain on the market while the FDA determines whether to approve it. 21 U.S.C. § 360e(b)(1)(A) (Supp.1999); *see also* 21 C.F.R. § 814.1(c)(1) (1999). This exception has been labeled the "grandfathering" provision. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 478, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Second, "to prevent manufacturers of grandfathered devices from monopolizing the market while new devices clear the [pre-market approval] hurdle, and to ensure

Donald Sharp has suffered a loss of consortium.

that improvements to existing devices can be rapidly introduced to the market, the Act also permits devices that are 'substantially equivalent' to pre-existing devices to avoid the [pre-market approval] process." *Id.; see also* 21 U.S.C. § 360e(b)(1)(B). In order to take advantage of this exception, the manufacturer must file a § 510(k) application that contains "information supporting the device's substantial equivalence to a predicate device, proposed labeling for the device, and any additional information requested by the FDA." *Orthopedic Bone Screw*, 159 F.3d at 819 (citing 21 C.F.R. § 807.87 (1999)). The FDA will then approve the device under the § 510(k) exception if it "has the same intended use as the predicate device and . . . it possesses the same technological characteristics or is as safe and effective as the predicate device." *Id.* (citing 21 U.S.C. § 360c(i)(1)(A)).[2]

Finally, the FDCA and MDA contain several exemptions, one of which is the Custom Device Exemption. Section 360j(b) of title 21 specifically exempts from FDA pre-market approval and performance standards any device that is (1) "not generally available upon prescription and is not offered through labeling or advertising by the manufacturer" and (2) "is intended for use by an individual patient named in such order of such physician . . . and is to be made in a specific form for such patient." 21 U.S.C. § 360j(b) (Supp. 1999).

### III. Standard of Review

The movant is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). This rule allows parties to demonstrate prior to trial that opposing claims "have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The inquiry here is "whether there is any need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Thereafter, the burden shifts to the non-moving party to demonstrate that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### IV. Discussion

■ In Pennsylvania, a plaintiff may recover on a theory of negligence if he or she proves "(1) that the defendant owed a duty to the plaintiff, (2) that the defendant breached that duty, (3) that the breach of duty was the 'proximate' or 'legal' cause of the accident and (4) the plaintiff suffered an actual loss or damage." *Gilson v. Doe*, 143 Pa.Cmwlth. 591, 600 A.2d 267, 270 (1991); *see also Novak v. Kilby*, 167 Pa. Cmwlth. 217, 647 A.2d 687, 690 (1994).

---

**2.** A device is "substantially equivalent" to a predicate device if it:

  (i) has the same technological characteristics as the predicate device, or

  (ii)(I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including appropriate clinical or scientific

data if deemed necessary by the Secretary . . ., that demonstrates that the device is as safe and effective as a legally marketed device, and

  (II) does not raise different questions of safety and effectiveness than the predicate device.

21 U.S.C. § 360c(i)(1)(A) (Supp.1999).

■ Pennsylvania recognizes that the traditional standard of care, that of a reasonable person under the circumstances, may be prescribed by legislative enactment so that "a violation of the statute or ordinance may serve as the basis for negligence *per se*." *Wagner v. Anzon, Inc.*, 453 Pa.Super. 619, 684 A.2d 570, 574 (1996). To establish a claim based on negligence *per se*, the plaintiff must show: (1) that the purpose of the statute is "at least in part, to protect the interest of a group of individuals, as opposed to the public generally;" (2) that the statute clearly applies to the conduct of the defendant; (3) that the defendant violated the statute; and (4) that the violation was the proximate cause of the plaintiff's injuries. *Id.* at 574. Regarding the first requirement, the Pennsylvania Supreme Court has adopted section 286 of the Restatement of Torts which states that the purpose of the statute must be: "(a) to protect a class of persons which includes Plaintiff; (b) to protect the particular interest which is invaded; (c) to protect that interest against the kind of harm which has resulted and (d) to protect that interest against the particular hazard from which the harm results." *Taylor v. Danek Medical, Inc.*, No. Civ. A. 95–7232, 1998 WL 962062, at *10 (E.D.Pa. Dec.29, 1998) (citing *Congini by Congini v. Portersville Valve Co.*, 504 Pa. 157, 470 A.2d 515, 517–18 (1983)); *see also* RESTATEMENT (SECOND) OF TORTS § 286 (1965).

### A. Purpose of the Statute

■ With respect to the first element, Artifex argues that since the FDCA and MDA do not provide for a private right of action, the statute does not contemplate enforcement of individual harms. Courts in Pennsylvania have recognized that the "absence of a private cause of action in a statutory scheme is an indicator that the statute did not contemplate enforcement of an individual harm." *Wagner*, 684 A.2d at 575; *see Frederick L. v. Thomas*, 578 F.2d 513, 517 n. 8 (3d Cir.1978); *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 428 (M.D.Pa. 1989). However, it is just an indicator or a

factor to consider and "does not necessarily preclude [the statute's] use as the basis of a claim of negligence *per se*." *Fallowfield Development Corp. v. Strunk*, CIV. A. No. 89–8644, 1990 WL 52745, at *19 (E.D.Pa. April 23, 1990). A statute may still be used as the basis for a negligence *per se* claim when it is clear that, despite the absence of a private right of action, the policy of the statute will be furthered by such a claim because its purpose is to protect a particular group of individuals. *See id.*

■ In *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413 (M.D.Pa.1989), residents of a community whose wells were allegedly contaminated by toxic substances brought a negligence *per se* claim based on the Solid Waste Management Act ("SWMA") and the Clean Streams Act ("CSA"). *See id.* at 415. Defendants argued that the claim should be dismissed because the statutes did not provide for a private right of action. *See id.* at 426. The court agreed and dismissed the claim because neither statute provided for a private cause of action and both expressly limited their enforcement to the Department of Environmental Protection. *See id.* at 428. The court emphasized that the statutes explicitly provided that they did not "in any way abridge or alter rights of action or remedies now or hereafter existing in equity, or under the common law or statutory law, criminal or civil. . . ." *Id.* (quoting Pa. Stat. Ann. tit. 35, §§ 6018.607, 691.701). It indicated that if it allowed the claim to proceed it "would be going against the expressed intentions of the legislature." *Id.* at 428.

The court distinguished *Lutz* in *Fallowfield Development Corp. v. Strunk*, CIV. A. No. 89–8644, 1990 WL 52745 (E.D.Pa. April 23, 1990). There, the plaintiffs brought a claim of negligence *per se* based on violations of the Pennsylvania Clean Streams Law ("CSL"), the Pennsylvania Solid Waste Management Act ("SWMA") and the Pennsylvania Hazardous Sites

Cleanup Act ("HSCA"). *See id.* at *1. They alleged that the defendants dumped and disposed of hazardous waste on their property and that as a result, they incurred costs connected with the cleanup. *See id.* The court acknowledged that none of the three statutes provided for a private right of action but stated that this did not necessarily preclude a negligence *per se* claim. *See id.* at *19. As to the Clean Streams Law, it agreed with *Lutz* that the absence of a private right of action suggested that the statute was not intended to protect a group of individuals; the purpose of the statute, it stated, was to ensure clean streams and only incidentally benefit individuals. *See id.* at *20. However, it distinguished the SWMA and HSCA from the CSL stating that their purpose was "to protect the citizens of this Commonwealth from the dangers of the improper disposal of hazardous and solid waste." *Id.* The court concluded that even in the absence of a private right of action, the plaintiff should be permitted to base a negligence *per se* action on the SWMA and HSCA because the policies of those statutes would be furthered by such a claim. *See id.*

We conclude that despite the absence of a private right of action, the FDCA and MDA were enacted to protect the interest of a group of individuals. Indeed, they were enacted "to provide for the safety and effectiveness of medical devices intended for human use." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Thus, their purpose was, at least in part, to protect the interests of those individuals who require use or implantation of medical devices. *See Murray v. Synthes U.S.A., Inc.,* No. Civ. A. 95–7796, 1999 WL 672937, at *8 (E.D.Pa. Aug.23, 1999); *Taylor v. Danek*

*Medical, Inc.,* No. Civ. A. 95–7232, 1998 WL 962062, at *10 (E.D.Pa. Dec.29, 1998). The FDCA and MDA are distinguishable from the statute at issue in *Lutz.* The Clean Streams Law was intended primarily to protect the environment while only incidentally protecting all individuals as members of the general public. *See Lutz,* 718 F.Supp. at 428. Again, the FDCA and MDA were intended to protect the narrow group of individuals who require the use of or implantation of medical devices.[3]

In support of its argument, Artifex also cites *Cali v. Danek Medical, Inc.,* 24 F.Supp.2d 941 (W.D.Wis.1998), a pedicle screw device case which, like the instant case, flowed from the multi-district litigation in the Eastern District of Pennsylvania. In that case, the plaintiff sued the manufacturer under Wisconsin law for conspiracy to violate the FDA regulations. *See id.* at 944. The court stated that in order to sustain a claim under Wisconsin law for conspiracy to violate the FDCA, the violation would have to support a claim for negligence *per se. See id.* at 953. The court held that a claim was not stated, however, because the FDCA does not exhibit any legislative intention to create a private cause of action. *See id.* Rather, the court stated, the face of the statute indicates the opposite intention because it stresses that violations of the FDCA are only enforceable by the United States. *See id.* (citing 21 U.S.C. § 3337(a)).

*Cali* is distinguishable from our case, however, because it was based on Wisconsin law which requires the plaintiff to show that "there is some expression of legislative intent that the statute become a basis for civil liability." *Id.* at 953–54 (citation omitted). Pennsylvania law, on the other hand, only requires the plaintiff to show that the purpose of the statute is to pro-

---

**3.** The particular factors of section 286 of the Restatement of Torts have also been established. Barbara Sharp was the ultimate user of a device regulated by the statute and thus is among the class of persons that the FDCA and MDA intended to protect. Further, both the FDCA and MDA were enacted to protect against the kind of harm which allegedly resulted here; that is, injuries caused by medical devices which present a potential unreasonable risk of injury. *See Murray,* 1999 WL 672937 at *8; *Taylor,* 1998 WL 962062 at *10.

tect a particular group of individuals. *See Wagner,* 684 A.2d at 574. The absence of a private right of action may indicate that the legislature only intended to protect the general public. *See id.* It does not always give rise to such an inference, however, and the statute may still be used as the basis for a negligence *per se* claim where, as here, it is clear that the policy of the statute will be furthered by the claim because its purpose is to protect a particular group of individuals. *See Fallowfield,* 1990 WL 52745, at *19.

Our conclusion is supported by two decisions from the Eastern District of Pennsylvania. In *Murray v. Synthes U.S.A., Inc.,* No. Civ.A. 95–7796, 1999 WL 672937 (E.D.Pa. Aug.23, 1999) and *Taylor v. Danek Medical, Inc.,* No. Civ.A. 95–7232, 1998 WL 962062 (E.D.Pa. Dec.29, 1998), the plaintiffs sued the manufacturers of pedicle screw devices to recover for injuries which allegedly arose out of the implementation of defendants' devices. After the case was transferred back from the same multi-district proceedings as this case, the defendants moved for summary judgment on negligence *per se* claims. The courts denied their motions, however, and in doing so, held that the first requirement to establish a negligence *per se* claim under Pennsylvania law was satisfied. *See Murray,* 1999 WL 672937 at *8; *Taylor,* 1998 WL 962062 at *10. They held that the FDCA and MDA were enacted to protect a particular group of individuals because their purpose was to "provide for the safety and effectiveness of medical devices intended for human use." *Murray,* 1999 WL 672937 at *8 (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 474, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)); *Taylor,* 1998 WL 962062 at *10 (same).

In sum, we hold that the first requirement for maintaining a claim of negligence *per se* has been established. The FDCA and MDA were enacted to protect the interest of a particular group of individuals; they were enacted to protect the interests of those individuals who require

the use or implantation of medical devices. *See Murray,* 1999 WL 672937 at *8; *Taylor,* 1998 WL 962062 at *10. Thus, despite the absence of a private right of action, the policies of the FDCA and MDA will be furthered by allowing such a claim.

**B. Whether the FDCA and MDA Apply to the Conduct of Defendant**

■] Artifex next argues that the statute does not apply to its conduct because the device implanted into Barbara Sharp's spine was custom made for her and therefore is exempt from FDA premarket approval and reporting requirements. The custom device exemption of the MDA specifically exempts from the performance and premarket approval requirements any device which (1) "is not generally available in finished form for purchase or for dispensing upon prescription and is not offered through labeling or advertising by the manufacturer, importer, or distributor thereof for commercial distribution," and (2) is intended for the use of a particular patient named in a physician's order and "is not generally available to or generally used by other physicians or dentists." 21 U.S.C. § 360j(b) (Supp.1999).

Our research and that of the parties has disclosed only one case in which a court interpreted the meaning of the custom device exception. In *Contact Lens Manufacturers Association v. Food & Drug Administration,* 766 F.2d 592 (D.C.Cir.1985), the Contact Lens Manufacturers Association ("CLMA") filed suit to challenge the FDAs withdrawal of its own proposal to transfer certain contact lenses from Class III to Class I. *See id.* at 594. In addition to arguing that the FDA's decision not to reclassify the lenses was unreasonable, the CLMA argued that the lenses qualified for the custom device exemption because each individual lens was "ground to a particular doctor's specifications." *Id.* at 599.

The court disagreed and held that "the FDA acted reasonably in refusing to accord custom-device status to [the] lenses." *Id.* It stated that the exemption merely

"reflect[s] a commonsense congressional judgment that the design and composition of certain medical devices are so individu-·alized that subjecting them to the usual regulatory controls would be impractical." *Id.* It also stated that the legislative history indicated that "invocation of the exemption must be 'limited'" and the statutory language should be read "as referring to a more or less inclusive class of devices rather than to any given exemplar of the class." *Id.*Furthermore, the court noted that even if the relevant question were "whether a specifically prescribed lens was 'generally available to or generally used by other doctors,' there would be force to the FDA's contention that any specimen lens is merely a variation within an approved range of powers and anterior and posterior surface contours." *Id.* Thus, the court held that the mere fact that a lens may have to be designed to fit the shape of a person's eye did not render it a custom device. *See id.*

We hold that given the narrow reading of the statute in *Contact Lens Manufacturers Association,* there is a material issue of fact as to whether the Defendant's device falls within the custom device exemption. There is evidence on the record which indicates that each of the Artifex's pedicle screw fixation devices is made only upon a physician's order for use with a specific patient. *See* Baker Aff. ¶¶ 4–5; Hafeli Depo. at 117. The physician provides Artifex with data from a CT scan and Artifex manufactures the device to fit the spine of the particular individual. *See* Baker Aff. ¶¶ 5–8, 12; Hafeli Depo. at 117–123. However, the record also contains correspondence from the FDA to other pedicle screw fixation device manufacturers in which the FDA declares that pedicle screw fixation devices are not subject to the custom device exemption. *See* Pls. Br. Ex. A, B. The parties disagree as to whether the Artifex device differs from the devices of the other manufacturers.[4]

4. Artifex does not contest the remaining two

## V. Conclusion

Defendant's motion for summary judgment on Count II is denied. Defendant's request for judgment in its favor on all other counts to the extent that they rely on alleged violations of the FDCA and MDA is also denied because we found that there is a material issue of fact as to whether the defendant's device falls within the custom device exception. An appropriate order follows.

### *ORDER*

AND NOW, this _____ day of September 1999, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED THAT Defendant's Motion for Partial Summary Judgment [Doc. No. 10] is DENIED.