**ETHICON, INC., Plaintiff,**

v.

**FOOD AND DRUG ADMINISTRATION and Louis W. Sullivan, M.D., Secretary, Department of Health and Human Services, Defendants,**

and

**United States Surgical Corporation, Defendant–Intervenor.**

**Civ. A. No. 90–1797 (JHG).**

United States District Court, District of Columbia.

April 11, 1991.

Max O. Truitt, Daniel Marcus, Randolph P. Moss, Wilmer, Cutler & Pickering, Washington, D.C., for plaintiff.

Michael T. Ambrosino, Asst. U.S. Atty., Mark Heller and Lucy Russell, Attys., FDA, Rockville, Md., for defendants.

Sanford M. Litvack, Anthony J. Viola, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant-intervenor.

## AMENDED MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Pending before the Court are the cross-motions of the parties for summary judgment. On consideration of the pleadings, the administrative record, and the oral hearing held on this matter, and for the reasons set forth below, defendants' and defendant-intervenor's motions are granted and plaintiff's motion is denied.

### I. BACKGROUND

Plaintiff Ethicon, Inc. manufactures VICRYL poly(glycolide/L-lactide) absorbable surgical sutures ("poly (g/l) sutures"). Ethicon challenges the decision by defendants Food and Drug Administration ("FDA") and Secretary of Health and Human Services Dr. Louis W. Sullivan ("Secretary") to reclassify a generic class of poly (g/l) sutures from Class III to Class II under the Medical Device Amendments

("Amendments") to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–392 (1988) ("the Act").[1] Ethicon seeks a judgment declaring the reclassification decision null and void for FDA's alleged failure to fulfill both substantive and procedural statutory requirements for the reclassification of medical devices. Ethicon further requests an injunction preventing FDA from implementing or enforcing its decision and an order directing FDA to rescind all actions taken pursuant to the decision.

## A. The Regulatory Scheme

In 1976, Congress passed the Medical Device Amendments, establishing a three-tiered scheme of regulating medical devices. Class I devices are those deemed in need of the least regulatory oversight, with the general controls of the Act considered sufficient to ensure safety and effectiveness. 21 U.S.C. § 360c(a)(1)(A). Class II devices are those for which the general controls in the Act are deemed insufficient by themselves to provide reasonable assurance of safety and effectiveness, but for which there is sufficient information to establish performance standards that assure their safety and effectiveness. Id. § 360c(a)(1)(B). Class III devices are those that do not meet the criteria of the first two classes. They are defined as devices that are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" or that present "a potential unreasonable risk of illness or injury." Id. § 360c(a)(1)(C). Manufacturers of such devices must obtain premarket approval from FDA to market the devices pursuant to the requirements and procedures set forth in § 360e ("PMA").[2]

Outside of but related to the above classification scheme, medical devices are categorized as within three types: "pre-amendment" devices, those in distribution prior to the enactment date of the Amendments; "transitional devices," products within the definition of "devices" and regulated, before the Amendments, as drugs; and "post-amendment devices," those first introduced after the Amendments and not substantially equivalent to pre-amendment devices. Initially, all transitional devices were automatically classified into Class III, with the potential for reclassification. See id. § 360j($l$)(1). The statute further provides that if a new device were substantially equivalent to a transitional device, that device would be placed in the same class as the transitional device and subject to the same regulatory controls. Id. § 360j($l$)(1)(D).

Devices that are introduced into interstate commerce after the effective date of the Amendments are also automatically classified as Class III unless they are shown to be of a non-class III type of device and to be "substantially equivalent" to a particular device already so classified. Id. § 360c(f)(1)(A). FDA may reclassify any device deemed to be overclassified, but only upon a proffer of "valid scientific evidence" of safety and effectiveness. 21 C.F.R. §§ 860.7, .123(a)(6). See generally Contact Lens Manufacturers Association v. Food & Drug Administration, 766 F.2d 592, 593–94 (D.C.Cir.1985), cert. denied, 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 784 (1986) ("Contact Lens"). Section 360j($l$)(2) outlines the procedures for reclassification of transitional devices.[3]

## B. Factual Background

In May 1987, defendant-intervenor United States Surgical Corporation ("USSC") petitioned FDA to reclassify a generic class

---

**1.** The Safe Medical Devices Act of 1990, Pub.L. No. 629, 101st Cong., 1st Sess., 104 Stat. 4511 (Nov. 28, 1990), substantially amended this statute. The 1990 amendments have no bearing on this case, however, as it concerns FDA action prior to their enactment.

**2.** Pre-market approval involves the most rigorous review of devices under the Act, see 21

U.S.C. § 360e(c)(1) (describing required contents of application), including notice and comment rulemaking, id. § 360e(b), before such a device may be marketed. See also 21 C.F.R. Part 814.

**3.** See infra.

of poly (g/l) sutures from Class III to Class II.[4] Administrative Record ("AR") at 1–1041. FDA referred the petition to its Administrative Panel on General and Plastic Surgery Devices ("Panel"),[5] *id.* at 1049–51, and a notice of the Panel's meeting was duly announced. *See* 52 Fed.Reg. 23,081, 23,082 (June 17, 1987). The Panel received written testimony and held a hearing on August 28, 1987. Transcript of General and Plastic Surgery Devices Panel Meeting, Aug. 28, 1987 ("Panel Tr."), AR at 6353–6584Q. At the close of the hearing, the Panel unanimously recommended that poly (g/l) sutures be reclassified from Class III to Class II. Panel Tr. at 235, AR at 6584F. On June 15, 1988, plaintiff Ethicon,[6] which had participated in these proceedings, *e.g.,* Panel Tr. at 164–79 (oral testimony), AR at 6518–33; AR at 3031–78 (written submissions),[7] submitted further arguments to the effect that FDA wrongly applied the § 360j(*l*)(2) provisions and should have examined the petition under § 360c(e). AR at 3188, 3204.

After further study, on September 14, 1989, FDA issued a letter ruling ("1989 Letter Ruling") granting USSC's petition and reclassifying the generic class of poly (g/l) sutures. 1989 Letter Ruling, AR at 3221–36. FDA found that sufficient publicly available scientific evidence existed to enable development of a performance standard for poly (g/l) sutures, the generic class of poly (g/l) sutures was well-characterized, and reclassification was warranted. *Id.* It specifically commented that "a class III designation for absorbable poly (g/l) surgical suture constitutes overregulation." 1989 Letter Ruling at 4, AR at 3224. FDA defined the generic class as including

any "absorbable sterile, flexible strand as prepared and synthesized from homopolymers and copolymers made from glycolide and/or L-lactide." 1989 Letter Ruling at 1, AR at 3221. It thus determined that the generic class encompasses VICRYL and DEXON and any other poly (g/l) sutures that in the future could be shown to be substantially equivalent to either of them. *Id.*

On November 2, 1989, Ethicon petitioned FDA to reconsider the reclassification decision and asked for a stay pending the decision on its petition. AR at 6601–6726. On July 5, 1990, FDA issued a letter ruling ("1990 Letter Ruling") denying Ethicon's motion for a stay and petition for reconsideration. 1990 Letter Ruling, AR at 6898–6911. In the 1990 Letter Ruling, FDA also modified the definition of the generic class set forth in the 1989 Letter Ruling by narrowing it to include only poly (g/l) sutures made from 100% glycolide or from 90% glycolide and 10% L-lactide, which ratios correspond to the structures of VICRYL and DEXON. 1990 Letter Ruling at 8, AR at 6905.

In August 1990, Ethicon initiated this lawsuit. The instant cross-motions for summary judgment followed. A hearing on the motions was held on February 15, 1991. Four days later, Ethicon filed a motion for a temporary restraining order and preliminary injunction. After a hearing on February 20, the Court denied the motion. *See* Order, Feb. 20, 1991.

## II. DISCUSSION

Ethicon argues that FDA reached its reclassification decision improperly by failing

**4.** The Petition for Reclassification was accepted and filed by the Secretary on May 4, 1987. Administrative Record ("AR") at 4. An amended petition was filed on June 25, 1987. AR at 1052.

**5.** The Panel, pursuant to 21 U.S.C. § 360c(b)(2), is appointed by the Secretary and consists of persons "qualified by training and experience to evaluate the safety and effectiveness of the devices to be referred to the panel." *Id.* The Panel here consisted of several prominent doctors and medical professors. *See* AR at 6355–59.

**6.** Ethicon controls approximately 80% of the market for poly (g/l) sutures. *See* Transcript of Hearing on Motion for Temporary Restraining Order and Preliminary Injunction, Feb. 20, 1991, at 5. Davis & Geck of the American Cyanamid Company, not a party to this action, is Ethicon's sole competitor in this market. *Id.*

**7.** The other manufacturer of poly (g/l) sutures, Davis & Geck, also participated extensively. *E.g.,* Panel Tr. at 144–63, AR at 6496–6518 (oral testimony); AR at 2941–3030 (written submissions).

to satisfy both the substantive and procedural statutory requirements for reclassification. It thus asserts that FDA's decision was arbitrary and capricious and therefore violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). Defendants urge the Court to reject these arguments and find instead that it carefully considered the relevant factors for reclassifying poly (g/l) sutures, as set forth in the Act, the Amendments, and the agency's regulations, and formulated a reasoned order based on the administrative record.

A. Standard of Review

 Section 706 of the APA provides that a court may set aside an agency action only where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, there is a presumption in favor of the validity of administrative action. A court cannot substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Ethicon asserts that FDA abandoned its established policies, and therefore its action is subject to a rigorous standard of review. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971) (agency must provide "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"). In particular, Ethicon avers that FDA departed from the standards it employed in the reclassification proceedings of another medical device, in the *Contact Lens* case. Defendants argue that Ethicon is demanding an incorrect standard of review as well as a misinterpretation of the controlling standard. Defendants are correct. As explained *infra,* *Contact Lens* does not set forth a universal rule that FDA follows in reclassifying devices; that case is inapposite here because of its distinct facts.

Congress gave FDA sweeping discretion in determining the classification of devices and therefore in judging the safety and effectiveness of medical devices. *See* H.R.

Rep. No. 853, 94th Cong., 2d Sess. 12–13 (1976) ("House Report"). Within the statute, to cite a few pertinent examples, Congress directed that the effectiveness of a device be determined "in accordance with regulations promulgated by the Secretary, on the basis of well-controlled investigations," 21 U.S.C. § 360c(a)(3)(A), gave the Secretary discretion to determine when valid scientific evidence exists concerning a device, *id.* § 360c(a)(3)(B), and provided that the Secretary "*may* by regulation, promulgated in accordance with this section, establish a performance standard." *Id.* § 360d(a)(1) (emphasis added). Indeed, in the *Contact Lens* case so heavily relied on by plaintiff, the D.C. Circuit recognized "the broad administrative discretion Congress conferred upon the FDA" in the context of reclassification. 766 F.2d at 594.

 Because the action at issue involves an interpretation by the agency of its own statute and regulations, the court must be especially deferential. *See United States v. Rutherford,* 442 U.S. 544, 553, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979); *Satellite 8301123 v. Hodel,* 648 F.Supp. 410, 413 (D.D.C.1986). The decision need not even be one that this Court would independently reach, given the findings and the law; it need only be reasonable. *Aluminum Co. of America v. Central Lincoln Peoples' Utility District,* 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984); *see also Chevron U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

 Nonetheless, this deference is not abdication. The record must be scrutinized to determine "whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. The Court must also find that the relevant factors on which the decision is based are supported by some evidence. *Ritter Transportation, Inc. v. ICC,* 684 F.2d 86, 88 (D.C.Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983).

### B. Substantive Arguments

Ethicon alleges that three substantive deficiencies flaw FDA's decision. First, it asserts that FDA improperly characterized the generic class of devices when it assumed that all poly (g/l) sutures within the generic class are essentially identical, ignoring evidence that differences in the composition and manufacture of such sutures affect their safety and effectiveness. Second, it claims that FDA cannot show a basis for a performance standard for poly (g/l) sutures. Finally, Ethicon argues that FDA improperly relied on the § 360k premarket notification process to assure the safety and effectiveness of new poly (g/l) sutures.

### 1. *The Generic Class of poly (g/l) sutures*

■ Ethicon's first set of arguments centers on its contention that FDA's decision was grounded in an "inadequate characterization of the generic class" of poly (g/l) sutures. Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memo") at 23. Ethicon faults FDA for wrongly generalizing from existing information, for assuming that all poly (g/l) sutures with the same glycolide-L-lactide ratios as the two on the market are "essentially identical." Ethicon alleges that by basing the reclassification on published evidence limited to VICRYL and DEXON, FDA contradicted the approach it followed in the *Contact Lens* case, where FDA denied reclassification because it determined that insufficient information existed to assure safety and effectiveness of certain contact lenses or to identify a generic class of such lenses for the purpose of reclassification. Finally, Ethicon claims that "[t]he few paragraphs found in the publicly available literature that do discuss the manufacturing processes of poly (g/l) sutures are no substitute for the detailed description

... necessary to adequately understand the manufacturing variables and conditions that may affect the safety and effectiveness of any particular suture." Plaintiff's Memo at 23–24.

■ A review of the regulatory structure governing the determination of generic classes, briefly described above, and of *Contact Lens* reveals the lack of merit in Ethicon's arguments. First of all, there is no requirement that a device in a generic class be "essentially identical" to all others in its class. Rather, the device need only be "substantially equivalent." 21 U.S.C. §§ 360c(f)(1)(A), 360j(*l*)(1)(D). FDA has defined "generic type of device" as

> a grouping of devices that do not differ significantly in purpose, design, materials, energy source, function, or any other feature related to safety and effectiveness, and for which similar regulatory controls are sufficient to provide reasonable assurance of safety and effectiveness.

21 C.F.R. § 860.3(i).

The *Contact Lens* case is not applicable here because, simply put, it concerned a different device.[8] The agency's characterization of a generic class or type of device is fact-specific, 21 C.F.R. § 860.7(c)(2), as is evident from the factors FDA's regulations require it to consider in making the determination that a device is safe and effective. The Panel must consider, *inter alia*, the persons for whose use the device is intended, the conditions and intended conditions of use of the device, the probable benefit to health from use weighed against probable injury or illness from use, and the reliability of the device. *Id.* § 860.7(b). Inevitably the requisite evidence will vary, according to "the characteristics of the device, its conditions of use, the existence and adequacy of warnings and other restrictions, and the extent of experience with its use." *Id.* § 860.7(c)(2). FDA must base its consideration on the *nature* of the device and

---

8. As defendants also note, even were *Contact Lens* controlling, it is distinguishable. In that case, one of first impression involving the FDA's administration of the Medical Device Amendments, the generic class was much more broadly defined to include an entire family of materi-

als, 766 F.2d at 595, there was relatively little experience with use of the subject device, *id.*, and there was no information about the manufacturing processes involved. *Id.* at 601. As will be discussed *infra*, these problems do not exist with regard to poly (g/l) sutures.

"whether the available evidence, when taken as a whole, is adequate to support a determination that there is reasonable assurance that the device is safe and effective for its conditions of use." *Id.* § 860.7(c)(1). Accordingly, the particular factors considered in *Contact Lens* are not relevant here.

Furthermore, Ethicon's charge that FDA improperly relied on publicly available studies of the use of the two existing poly (g/l) sutures is misplaced, if not puzzling. Indeed, the regulations explicitly provide that the valid scientific evidence that must be considered in characterizing a generic device consists of

evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and *reports of significant human experience with a marketed device* ...

*Id.* § 860.7(c)(2) (emphasis added).

As defendants accurately note, the instant controversy ultimately turns on a disagreement between the parties as to the interpretation of the statutory definition of a Class II device—in other words, what constitutes "sufficient information to establish a performance standard" that will "provide reasonable assurance of the safety and effectiveness of the device." 21 U.S.C. § 360c(a)(1)(B). In essence, Ethicon is disputing the quantity and quality of the evidence FDA considered—it is disagreeing with the conclusion that the evidence supports a finding of safety and effectiveness.

In FDA's view, "sufficient information" for evaluating a device requires that valid scientific evidence in the record correlates the control of performance parameters to safe and effective use of the device. *See* 21 C.F.R. § 860.7(c), .5(f). Thus, the question is whether the administrative record contains sufficient information for the agency to understand the device and suffi-

cient evidence to demonstrate that factors determining the device's safety and effectiveness are controllable.

An examination of the two letter rulings and of the supporting administrative record, make clear that FDA more than satisfied its mandate. The 1989 Letter Ruling describes the manufacturing process, 1989 Letter Ruling at 6, AR at 3226, identifies both those studies and reports in the record showing that its performance parameters and uses are well-understood and present a reasonable uniform risk-benefit profile, *id.* at 7, AR at 3227, and those studies and reports that demonstrate that variability of composition and performance is minimal, *id.*[9] The studies and reports relied on are scientific papers published in reputable journals, and thereby fulfill the regulatory requirement that the valid scientific evidence relied on be based on, *inter alia*, "well-controlled investigations" and "documented case histories." *See* 21 C.F.R. § 860.7(c)(2).

That Letter Ruling also describes in detail the parameters that need to be controlled to provide reasonable assurance of safety and effectiveness of these devices: suture breakage, tissue inflammatory response, infection, and suture-related calculogenesis. After outlining each of these problems, the Letter Ruling then specifically references the plethora of studies relied on that discuss these matters and those that set forth testing methodologies that will evaluate these parameters. 1989 Letter Ruling at 8–14, AR at 3228–34.[10] An examination of the FDA's treatment of one of these four parameters, suture breakage, suffices to illustrate the thorough review the agency conducted to reach its conclusions. FDA describes the various causes of suture failure and the documentation thereof, such as where there is premature loss of its tensile strength (citing 20 references in the record), the factors that cause the failure, such as hydrolysis of the su-

---

9. The agency also concluded that sutures as thus characterized will perform successfully "notwithstanding different manufacturing processing," based on studies and reports in the record. *Id.*

10. The hundreds of studies relied on by FDA will not be individually recited here; they take up thousands of pages in the Administrative Record and tens of pages in the index to the Administrative Record.

tures (citing 31 references in the record), factors that studies have identified as contributing to suture degradation (citing 16 references in the record as to degradation by hydrolysis, with further studies referenced concerning the variables such as pH and enzyme presence that affect hydrolysis), and other factors such as the importance of proper surgical techniques in the use of the sutures. 1989 Letter Ruling at 8–11, AR at 3228–31. Based on the voluminous materials referenced, the agency thus concluded:

> Current testing methodologies exist to evaluate the critical performance parameters of tensile strength and absorption rate. These parameters are controlled in marketed poly (g/l) surgical sutures by end-product testing using USP tests.... Also, ASTM tests.... and other standardized test methods ... exist to assure adequate manufacturing processes and performance characteristics of poly (g/l) surgical sutures.
>
> Many of the above-identified performance parameters and risks of sutures can also be adequately controlled by labeling disclosures which may be incorporated into a class II standard or as required by the class I controls, including, among other things, the requirement of adequate directions for use.

*Id.* at 11, AR at 3231 (references omitted).

Ethicon nonetheless complains that factors other than the ratio of glycolide to L-lactide, which defines the generic class, and therefore limits the universe of information considered to the two marketed sutures, will affect safety and effectiveness, such as the structure of polymers and differences in manufacturing processes. The Court disagrees that FDA left these questions totally unanswered; as noted previously, for example, the manufacturing process was described. Indeed, the co-inventor and holder of the patent on poly (g/l) sutures testified to the Panel that "a sub-

stantial body of patent literature and journal articles have been published" that completely describe the necessary processes for manufacture. Panel Tr. at 186, AR at 6540.[11] He concluded that the sutures "would be adequately controlled by Class II regulations." Panel Tr. at 189, AR at 6543.

Finally, the Court does not weigh the evidence; it merely examines "the record to see if there is evidence, which if accepted by the Secretary, supports the determination of the agency." *National Soft Drink Association v. Block,* 721 F.2d 1348, 1354 (D.C.Cir.1983). It is clear that this record, replete with substantial, valid scientific evidence, more than adequately supports the agency's determination that there exists sufficient information to characterize and understand the generic class of poly (g/l) sutures and to establish the safety and effectiveness of these devices.

#### 2. *Performance Standard*

■ In a related argument, Ethicon also maintains that the agency failed to demonstrate, as required by statute, 21 U.S.C. § 360c(a)(1)(B), that a performance standard could be established. Ethicon asserts that for the agency to make this showing requires it to do two things: determine what tests must be performed, and explain how the values obtained on those tests would assure the safety and effectiveness of the new device. Ethicon contends that statements in the two letter rulings that "some test methods exist" and that end-product testing will suffice do not fulfill the statute's requirements.[12] *See* 1989 Letter Ruling at 6, AR at 3226; 1990 Letter Ruling at 9, AR at 6906. Furthermore, Ethicon argues that FDA did not establish that the publicly available scientific literature yields ranges of values that would constitute acceptable performance on the required tests.

---

**11.** He also testified: "When desired levels of molecular weight, fiber orientation and degree of crystallinity are achieved in manufacturing, the final product will exhibit a consistent strength." Panel Tr. at 188, AR at 6542.

**12.** Ethicon also asserts that this decision represents a departure from the standard applied in *Contact Lens.* As noted previously, however, that case is inapposite; reclassifications are determined on a device-specific basis.

Ethicon claims that "the publicly available evidence does not provide objective, quantifiable values for most of the relevant performance parameters of poly (g/l) sutures, including such critical parameters as breaking strength retention, absorption rate, tissue reaction, elasticity, and elongation." Plaintiff's Memo at 27. Specifically, Ethicon objects to the 1990 Letter Ruling conclusion that the two current poly (g/l) sutures "could serve as benchmarks to generate objective values" and that end-product testing will result in a performance standard.[13] 1990 Letter Ruling at 9, A.R. at 6906.

FDA urges the Court to reject this contention and instead find that it had a rational basis in the record to support its conclusion. FDA argues that it considered every critical performance parameter and that it correctly determined that the risks posed by poly (g/l) sutures may be controlled by a performance standard and the general controls of the Act. The 1989 Letter Ruling states that testing and labeling disclosures could help form a performance standard. 1989 Letter Ruling at 7–11, AR at 3227–31. In that ruling, as described above, FDA identified the scientific literature describing tests that evaluate poly (g/l) sutures' four critical performance parameters. See supra.

FDA's findings are more than satisfactory to demonstrate that there is sufficient information to establish a performance standard. To accept Ethicon's arguments otherwise would be to change the statutory language to require sufficient information that establishes a performance standard. But Congress did not require FDA to do so in these circumstances. Class II devices were envisioned by Congress to be regulated as practicable by performance standards promulgated by FDA. Congress recog-

nized that performance standards might not be in place, that Class II devices "eventually will be required to conform to performance standards," House Report at 26 (emphasis added), and that "a considerable period of time may elapse between classification of a device into class II and development of a standard for it," id. at 27. Congress directed that the advisory panels considering reclassification to Class II assign, where practicable, a priority level for the development of a performance standard for the device or devices installed, 21 U.S.C. § 360c(c)(2)(A)(ii), as part of its authorization to FDA to establish priorities, id. § 360c(d)(3). In other words, Congress knew that FDA could not establish performance standards for the universe of Class II devices, and encouraged FDA to use its discretion to pursue such standards in order of priority. Because the Panel here concluded that poly (g/l) sutures are safe and effective, well understood, and susceptible to state-of-the-art testing, it recommended that the lowest priority be assigned to developing a performance standard, Panel Tr. at 245, AR at 65840, and the FDA agreed with its recommendation. 1989 Letter Ruling at 15, AR at 3235.[14] In other words, the evidence showed that a performance standard was not immediately necessary to protect the public health.

FDA regulations permit reclassification to Class II without such a standard in place. See 21 C.F.R. § 860.3(c)(2). The regulations do require consideration of the nature of the device to establish that there exists "valid scientific evidence" adequate to show safety and effectiveness, id. § 860.7(c)(1), and that has been done here. See supra. Furthermore, FDA explained why it failed to specify which end-product test would be appropriate: because that

---

**13.** Here, once again, Ethicon attempts to use *Contact Lens* to challenge FDA's decisionmaking. In *Contact Lens,* the FDA rejected reclassification partly on the basis that the device's safety and effectiveness could not be inferred from the safety and effectiveness of other contact lenses unless a "predictable relationship" could be shown to exist between the test data and actual safety and effectiveness. *See* 48 Fed. Reg. 56,789. As noted *supra,* however, that case involved a completely different set of facts, and

does not contain the standard by which to judge the decisionmaking at issue here.

**14.** The factors FDA considered in setting priorities for the development of performance standard were set forth in a published policy statement. *See* Notice of Policy Statement on Class II Medical Devices, 50 Fed.Reg. 43,060 (Nov. 23, 1985).

will be done in the pre-market notification process ("PMN").[15] The "burden is always on the premarket notification submitter to demonstrate substantial equivalence" by showing "end product tests that demonstrate equivalence," and that is accomplished by identifying "end product tests that demonstrate the sutures' key performance characteristics." 1990 Letter Ruling at 9, AR at 6906. In other words, FDA need not specify which end-product tests will be appropriate because the proponent of a new product must do so; safety and effectiveness will be assured by that means, as well as by the classification. The issue is not whether FDA will be able to make substantial equivalence determinations; it is whether the generic class is sufficiently identified to permit comparisons of the safety and effectiveness of a newer device within that generic class. FDA, as the Court concluded above, has done that.

In light of the extensive data marshalled to determine poly (g/l) sutures' safety and effectiveness, in addition to the PMN process, the FDA's approach was neither unreasonable nor contrary to the statute. In a perfect world, performance standards would be set for each and all medical devices prior to their exposure to the public. In the imperfect, but not defective, world of medical device regulation created by Congress, performance standards are but a desired goal not required to be promptly reached.[16]

### 3. *Use of the Pre–Market Notification Process*

■ Ethicon also asserts that FDA wrongly relied on the § 360(k) process to assure safety and effectiveness of poly (g/l) sutures. This argument is itself misplaced. As Ethicon noted, because there is no performance standard, to assure safety and effectiveness FDA will rely on the

general controls of the Act—as is mandated by the Amendments, *see* 21 U.S.C. § 360c(a)(1)(B)—and these general controls include the § 360(k) process. In other words, while it is correct that Pre–Market Notification "is not intended to serve as a mini-PMA [ ], and cannot of itself ensure a device's safety and effectiveness," Plaintiff's Memo at 34, that is not the exclusive basis for FDA's determination.

FDA explicitly stated that *all* of the general controls of the Act were anticipated to make a "substantial contribution" to the regulation of poly (g/l) sutures. 1989 Letter Ruling at 14, AR at 3234. General controls apart from the PMN process address, *inter alia,* such matters as registration with the agency by medical device producers, recordkeeping and the filing of disclosure reports (21 U.S.C. §§ 360, 360i, 21 C.F.R. Part 807); the requirement of maintaining current good manufacturing practices (21 U.S.C. § 360j(f), 21 C.F.R. Part 820); the banning of devices (21 U.S.C. § 360f, 21 C.F.R. Part 895); and device labelling requirements (21 U.S.C. § 352, 21 C.F.R. Part 801).

In light of these controls and the agency's determination that there is enough publicly available scientific evidence about existing poly (g/l) sutures to compare them to purportedly equivalent products, Ethicon's contention must be rejected.

### C. Procedural Argument

■ Lastly, Ethicon asserts that FDA's decision is unlawful under the APA because it wrongly classified USSC's poly (g/l) sutures as a transitional device rather than as a new device. The consequence of this mischaracterization, Ethicon claims, is that FDA employed the streamlined reclassification procedures under 21 U.S.C. § 360j(*l* )(2), rather than those set forth in *id.* §§ 360c(e) and (f)(2). Ethicon rests its

---

**15.** The Act requires pre-market notification ("PMN") by "each person who is required to register under this section and who proposes to begin the introduction ... into interstate commerce for commercial distribution of a device intended for human use" at least ninety days before marketing the device. 21 U.S.C. § 360(k). The content and requirements for

PMN are set forth in FDA's regulations. *See* 21 C.F.R. § 807.81–.97.

**16.** Although the Act was passed in 1976, not a single performance standard had been issued by FDA as of August 1987. Panel Tr. at 242, AR at 6584L.

argument on the language of the two categories set forth in § 360j($l$)(1) that describe what may constitute a transitional device. Subparagraph (A) defines as transitional any device intended for human use for which on the enactment date of the Amendments "an approval of an application submitted under section 355(b) of this Title was in effect;" subparagraph (D) defines as transitional any device intended for human use "which is within a type of device described in subparagraph (A) ... and is substantially equivalent to another device within that type." 21 U.S.C. § 360j($l$)(1)(A), (D). A device in the (D) category must further "have on and after sixty days after the enactment date in effect an approved application under section 360e of this title." *Id.* § 360j($l$)(3)(D).[17] Ethicon thus reads the statute to mean that Congress did not intend for the transitional devices procedures to apply to *any* devices marketed after the sixty-day time limit, and indeed argues that Congress would not have wanted the transitional reclassification provisions to have indefinite applicability to post-enactment devices. Following this argument, FDA should have reclassified USSC's poly (g/l) sutures under the more rigorous procedures set forth in *id.* § 360c(f)(2).

This is a question of statutory interpretation: specifically, FDA's interpretation that its own statute permits the reclassification of poly (g/l) sutures under the Act's transitional provisions. It is undisputed that currently marketed absorbable poly (g/l) sutures (VICRYL and DEXON) were Class III transitional devices subject to an approved new drug application at the time of enactment. Thus, USSC's poly (g/l) suture qualifies as a Class III transitional device because it is within a *"type* of [such] device ... and is substantially equivalent to another device *within that type." Id.* § 360j($l$)(1)(D) (emphasis added).

As FDA reads the statute, the sixty-day time limitation is of no relevance to reclassification procedures under § 360j($l$)(2) for such devices because it was meant to apply only to devices marketed on the enactment date and to prohibit commercial distribution sixty days after the enactment date unless they fell within certain exemptions. According to FDA, Congress envisioned two groupings of devices: those on the market on the enactment date, for which reclassification petitions or PMA applications were filed within sixty days, and all other devices classified as transitional after that time. For the first grouping, FDA was required to decide reclassification petitions within 120 days. For the second, catch-all grouping, the procedures of § 360j($l$)(2) apply, and FDA is required to decide the petition within 180 days. In other words, this limited field of devices was entitled to reclassification decisions sixty days earlier than the remaining pool of transitional devices.

In any event, what FDA reclassified was a generic type of poly (g/l) sutures, currently consisting of VICRYL and DEXON and, by definition, *see id.* § 360j($l$)(1)(D), devices within that type.[18] FDA argues that Ethicon's contrary interpretation would render meaningless § 360j($l$)(2), which controls the reclassification of transitional devices, because if the time limit applied to § 360j($l$)(2) then no transitional devices other than those marketed at the time of the enactment would be able to be reclassified. Further, this reading would thwart Congress' intent that all similar devices be classified and regulated in a similar manner. *See* House Report at 12.[19] Had Congress intended to set a limit on the applicability of § 360j($l$)(1)(D) to substantially equivalent devices that were marketed during that constricted period, it could have explicitly stated so.

Under section 706 of the APA, there is a presumption in favor of the validity of ad-

**17.** Certain exceptions exist but are not applicable here. *See* 21 U.S.C. § 360j($l$)(3)(D)(ii).

**18.** Although this procedural argument was not raised in *Contact Lens,* it is interesting to note that the lenses at issue there were deemed transitional devices although they were not in exist-

ence when the Amendments were enacted. 766 F.2d at 594.

**19.** This intent is also evident from Congress' creation of the three-tiered regulatory scheme and its mandate concerning "substantially equivalent" devices. 21 U.S.C. § 360c(f)(1)(A).

ministrative action. A court cannot substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Where, as here, the challenged action involves an interpretation by the agency of its own statute, the Court must be especially deferential. *See United States v. Rutherford,* 442 U.S. 544, 553, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979). The Court cannot find FDA's interpretation of the Act in this regard unreasonable; it comports with Congress' overall intent that similar devices be regulated similarly, and does not flatly contradict the terms of the statute. In *Contact Lens,* the D.C. Circuit held that it must defer to the agency's decision even though it agreed there was substantial merit to the challenge before it because FDA "acted within an area of its expertise, it ruled in a manner at least arguably consistent with the statutory scheme, and it considered the matter in a detailed, adequately reasoned fashion." 766 F.2d at 597, citing *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. Accordingly, plaintiff's argument that FDA proceeded under the wrong section of the Act when reclassifying poly (g/l) sutures is rejected.[20]

### III. CONCLUSION

After four years of study and after the unanimous recommendation of an independent panel composed of eminent physicians and researchers, FDA determined that poly (g/l) sutures posed no threat to the health or safety of the public that would prevent them from being more than adequately regulated as Class II devices under the Act. The Court finds that "FDA has permissibly exercised its considerable discretion," *Contact Lens,* 766 F.2d at 594, and indeed reasonably acted, and therefore defers to the agency's decision. Accordingly, it is hereby

ORDERED that plaintiff's motion for summary judgment is denied; it is

FURTHER ORDERED that defendants' and defendant-intervenor's motions for summary judgment are granted. A separate judgment accompanies this Memorandum Opinion. It is

FURTHER ORDERED that this case is dismissed. There shall be no stay pending appeal, if any, for the reasons recited in this Memorandum Opinion.

### ORDER

Upon consideration of defendants' motion to clarify the Court's opinion to correct typographical and citation errors, and the plaintiff having been notified, it is hereby

ORDERED that the motion is granted. The Court's Memorandum Opinion and Order of March 25, 1991, is hereby vacated. It is

FURTHER ORDERED that the Amended Opinion issued this date be filed in lieu thereof.

---

**20.** The Court rejects Ethicon's contention that it did not receive the process it is due, that, as a consequence of FDA's failure to proceed under § 360c(f)(2), it was deprived of its opportunity to participate in the decisionmaking. As its voluminous contribution to the Administrative Record makes clear, *see supra,* Ethicon had and took advantage of every opportunity to comment on and challenge the process as well as the decision.